O’NIELL, Chief Justice.
 

 This is a jactitation suit, in which the plaintiff, being the owner in possession of' approximately 10,000 acres of land, avers that the defendants are slandering its title to the oil and gas rights and other mineral rights in the land. The plaintiff claims to have possession of the mineral rights by having possession of the land itself, and pleads that whatever mineral rights the-defendants may have had have become extinguished by nonuse, by the prescription, of ten years liberandi causa.
 

 One of the defendants, namely, Louisiana Central Lumber Company, in its answer, disclaimed any interest in the land orín any mineral rights therein. The other defendant, Louisiana Central Oil & Gas. Company, in its answer, disclaimed any interest in approximately 4,000 acres of the land, but claimed possession as owner of' the oil and gas rights and certain other-mineral rights in the remaining area of approximately 6,000 acres, described in the-plaintiff’s petition. The Louisiana Central Oil & Gas Company, being the only real, defendant in the suit, denied that the plain
 
 *626
 
 tiff ever owned or possessed any mineral rights in the .land, and hence pleaded that the plaintiff could not maintain the jactitation suit, or action of slander of title, for the oil and gas rights or other mineral rights in the land. After hearing the case the judge of the district court rejected the plaintiff’s demand and dismissed its suit on the ground that the plaintiff had never had adverse possession of the oil or gas rights or other mineral rights for which the plaintiff was suing to quiet its alleged title. The plaintiff is appealing from the decision.
 

 The suit is only -a jactitation suit, or an action for slander of title of the oil and gas rights and other mineral rights in the land which is owned and possessed by the plaintiff. That fact is conceded by all parties, and is insisted upon by the plaintiff in its pleadings and in its brief, and particularly in one of the closing paragraphs of the brief, where the plaintiff describes the judgment which it asks for. As to the 6,000 acres remaining in dispute, the plaintiff asks for a judgment ordering the defendants — within a time to be fixed in the judgment — say within sixty days from the date when the' judgment will become final • — either to disclaim any title or interest in the property or to assert herein, or by a separate suit in revendication of their rights, such rights as either or both of them may claim, and, in default thereof, that the defendants shall be forever barred from asserting any right or claim in or against the property.
 

 It is well settled — and not disputed — -that a jactitation suit, or an action for slander of title, can be maintained only by one who is in actual possession as owner, and only against one who is not in possession, of the property the title to which is sought to be quieted. South Louisiana Land Co. v. Riggs Cypress Co., 119 La. 193, 43 So. 1003; Labarre v. Burton-Swartz Cypress Co., 133 La. 854, 63 So. 380; Miller v. Albert Hanson Lumber Co., 134 La. 225, 63 So. 883; Siegel v. Helis et al., 186 La. 506, 172 So. 768; Rudd v. Land Co., 188 La. 490, 177 So. 583; Allison v. Maroun et al., 193 La. 286, 190 So. 408; City of Shreveport v. Kahn, 194 La. 55, 193 So. 461. It is also well settled — and is conceded by the parties to this suit — that the only judgment that can be rendered against the defendant in a jactitation suit, if he does not see fit to convert the action into a petitory action, is a judgment ordering him to assert his claim by way of a petitory action, or an action in revendication, within a time to be fixed in the judgment, or be forever barred from laying claim to the property of which the plaintiff is in possession and of which he is seeking to quiet his title. Siegel v. Helis, 186 La. 506, 172 So. 768; Allison v. Maroun, 193 La. 286, 190 So. 408. In such a case the title or ownership of the property involved, whether corporeal or incorporeal, is not in contest, and is not to be considered by the court except to the extent necessary to determine whether the plaintiff is really in possession as owner of the property.
 

 The only question in this case therefore is whether the plaintiff, International Paper Company, was in actual possession as owner of the mineral rights in dispute,— and consequently whether the defendant, Louisiana Central Oil & Gas Company,
 
 *628
 
 was not in adverse possession of these rights — at the time when this suit was filed.
 

 The facts concerning the question of possession are not disputed. On May 25, 1926, the Louisiana Central Lumber Company, having an absolute title, in full ownership, of more than 200,000 acres of land, in the Parishes of Jackson, Winn, Ouachita, Caldwell, LaSalle and Catahoula, sold to its subsidiary, the Louisiana Central Oil & Gas Company, the mineral rights described in the deed as “all of the oil, gas, ore, and any and all other minerals of whatsoever kind, nature, character and description, with the exception of lignite, lime, limestone, sulphur, sand, clays and gravel”, on or within or under the 200,000 or more acres of land. The deed was recorded in the six parishes, being recorded in Caldwell Parish on August 9, in LaSalle Parish on August 11, and in Catahoula Parish on August 12, 1926.
 

 On July 31, 1926, the Louisiana Central Lumber Company sold to the Bastrop Pulp and Paper Company a part of the land in which the lumber company had sold to the Oil & Gas Company the mineral rights on May 25, 1926. The land which the Lumber Company sold to the Bastrop Pulp and Paper Company embraces the 10,000 acres described in the plaintiff’s petition in this suit, and is situated in the Parishes of Caldwell, LaSalle and Catahoula. But the deed from the Louisiana Central Lumber Company to the Bastrop Pulp and Paper Company-contained the following reservation of the mineral rights: “It is understood and agreed that Louisiana Central Lumber Company, vendor, excepts from this sale and reserves for itself, its successors and assigns, all of the oil, gas, ore, and any and all other minerals of whatever kind, nature, character and description that may be on, w'ithin and under the lands in this deed, described and conveyed, or supposed to be-on, within and under the lands in this act described and conveyed, with the exception of lignite,, coal, lime, limestone, sulphur and clays that might be used in paper mills,, and gravel.”
 

 By an amendment of the charter of the. Bastrop Pulp and Paper Company its name was changed to Southern International Paper Company; and the company sold to the International Paper Company on December 9, 1927, the land which it had bought from the Louisiana Central Lumber Company on July 31, 1926. The International Paper Company sold the land to the Southern Kraft Corporation on May 16, 1930; and that corporation was. merged into the International Paper Company, which is the plaintiff in this suit.
 

 In all of the deeds by which the land, was transferred, through mesne conveyances, from the Bastrop Pulp and Paper Company (afterwards named Southern International Paper Company) to the plaintiff, International Paper Company, it was declared that the transfer was made subject to all mineral leases, easements and servitudes theretofore granted to third' persons by the vendor or by any of its. predecessors in title as disclosed by the instruments on record in the several parishes in which the land was situated.
 

 The. sale of the mineral rights by the Louisiana Central Lumber Company to the
 
 *630
 
 Louisiana Central Oil & Gas Company was recorded before the sale of the land by the Louisiana Central Lumber Company to the Bastrop Pulp and Paper Company was filed for record, in every parish in which the land sold to the pulp and paper company was situated. In Catahoula Parish the two acts of sale were filed for record on the same day, but the sale of the mineral rights to the Louisiana Central Oil & Gas Company was filed before the sale of the land to the Bastrop Pulp and Paper Company was filed for record.
 

 The land in which the defendant, Louisiana Central Oil & Gas Company, acquired the mineral rights, the possession of a part of which is in contest in this suit, consists of two separate tracts. The smaller tract has an area of 4,070 acres, of which the mineral rights in 280 acres are involved in this suit. Of the larger tract there are nearly 6,000 acres in which the mineral, rights are involved in this suit.
 

 The Louisiana Central Oil & Gas Company, through a lessee, commenced drilling a well for oil or gas on the smaller tract on November 1, 1929, and drilled beyond the depth at which any oil or gas had been produced in the nearest oil or gas field. The well was completed and abandoned as a dry hole on November 24, 1929; but the completion of the well was a fair test on the part of the Louisiana Central Oil & Gas Company. On May 20, 1930, the same lessee of the Louisiana Central Oil & Gas Company commenced drilling a well in search of oil or gas on the larger of the two tracts of land, but after drilling to a depth sufficient to- make the well a fair test abandoned it on June 17, 1930, as a dry hole. Another lessee of the Louisiana Central Oil & Gas Company then drilled on the larger tract of land eight wells, in succession, between February 1, 1936, and August 18, 1939, all of which wells were finally abandoned as dry holes, but were drilled to a depth sufficient to be fair tests. The longest interval between the drilling of any two of the eight wells wa? only six months, and the shortest interval was only four months. Meanwhile, that is, on August 13, 1939, another lessee of the Louisiana Central Oil & Gas Company commenced drilling another well on the smaller tract, and drilled to the depth of 7,538 feet, which at that time was considered a deep test; but that well also was a dry hole and was abandoned as such on October 1, 1939. Thereafter a new oil field was discovered in the. vicinity, and, in April or May, 1940, the lessee who had drilled the eight wells on the larger tract went into the deep well which had been abandoned as a dry hole on October 1, 1939, on the smaller tract, and obtained what are called sidewall cores, with the hope of making the well a producer, but found no indication of production of either oil or gas. Meanwhile, that is, on February 15, 1940, the same lessee commenced drilling his ninth well on the larger tract of land, and completed the well as a producer of oil in paying quantities on March 25, 1940. This suit was filed less than ten months afterwards, that is, on December 18, 1940; at which time the lessees of the Louisiana Central Oil & Gas Company had drilled and were operating sixty-three producing oil wells on the plaintiff’s part of
 
 *632
 
 the larger tract of land. And at the time of the trial of the case the lessees of the Louisiana Central Oil & Gas Company had completed and were operating more than a hundred producing oil wells on the plaintiff’s part of the larger tract.
 

 The plaintiff, International Paper Company, or its predecessors in title, — the Southern Kraft Corporation, or Bastrop Pulp & Paper Company, or Southern International Paper Company, — never attempted to take possession of — or to exercise — any mineral rights on any part of the land that was bought by the Bastrop Pulp & Paper Company from the Louisiana Central Lumber Company on July 31, 1926, and that was afterwards transferred through mesne conveyances to the International Paper Company, plaintiff in this suit. The plaintiff and its predecessors in title have had continuous possession of the land .itself — which was cut-over timber land' — in the only way in which such land could be possessed; that is, by having the land surveyed and cruised and by felling and removing the pulpwood and. other timber remaining on the land. But those operations never interfered with the Louisiana Central Oil & Gas Company’s possession or exercise of its mineral rights by the mining operations of its lessees, which we have described.
 

 The plaintiff in this suit, having possession of the land under a deed which excluded the mineral rights which are involved in this suit, and which were in fact possessed adversely and exercised by the defendant under a recorded title, found it necessary to plead that the defendant’s claim to the mineral rights had become extinguished by nonuse, by the prescription of ten years liberandi causa. We cannot decide in this case whether the plea of prescription is or is not well founded, without thereby deciding finally whether the plaintiff or the defendant has title to the mineral rights; and it is conceded on both sides that that question is not at issue in this jactitation suit.
 

 The plaintiff depends upon the rule that one who has possession of the surface of a tract of land as owner may maintain a jactitation suit against one who slanders the possessor’s title by claiming mineral rights in the land. But that rule has its qualifications, one of which is that if the possessor of the land holds under a deed which on its face excepts the mineral rights, or if the so-called slanderer holds a recorded deed for the mineral rights, the possessor of the surface of the land — in order to maintain his jactitation suit — must allege and make a prima facie showing that the outstanding claim of the slanderer for the mineral rights 'has been extinguished by the prescription of ten years liberandi cause. In such a case the possessor of the surface as owner of the land cannot maintain a jactitation suit against a defendant w-ho has a recorded deed for the mineral rights if the defendant is actually, and adversely possessing or exercising the mineral rights. Mineral rights and mineral leases are by Act 205 of 1938 “defined and classified as real rights and incorporeal immovable property, and may be asserted, protected and defended in the same manner as may be the owner
 
 *634
 
 ship or possession of other immovable property by the holder of such rights”. It is declared in article 3432 of the Civil Code that possession of incorporeal property, such as servitudes, is had by the exercise of such rights. See Connell v. Muslow Oil Co, 186 La. 491, 172 So. 763; Allison v. Maroun, 193 La. 286, 190 So. 408; and In re Mt. Forest Fur Farms of America, Inc., 122 F.2d 232, where the United States Circuit Court of Appeals for the Sixth Circuit reviewed extensively the law of Louisiana recognizing that mineral rights are subject to actual possession, adverse to the possessor of the land itself, by the exercise of such rights.
 

 The plaintiff in this case relies upon Frost-Johnson Lumber Co. v. Sailing’s Heirs, 150 La. 756, 91 So. 207, and Wetherbee v. Railroad Lands Co, 153 La. 1059, 97 So. 40, 41, to support the contention that the possession as owner of the surface of a tract of land entitles the possessor to maintain a jactitation suit notwithstanding the defendant is exercising the mineral rights at the time when the suit is filed. In the Frost-Johnson case the defendants in their answer claimed ownership of the mineral rights, in response to which claim the plaintiff pleaded the prescription of 10 years liberandi causa, treating the defendants’ answer as a conversion of the suit into a petitory action. By consent of all parties the plea of prescription was referred to the merits of the case and was dealt with as having put at issue the question of title to the mineral rights. The district court overruled the plea of prescription but this court reversed the ruling, maintained the plea of prescription, and declared the land to be free from the defendants’ claim to the. mineral rights. That decision is not authority for the proposition that, if the defendant in such a jactitation suit denies that the plaintiff is in possession of the mineral rights, and declines to convert the action into a petitory action, the plaintiff may maintain his jactitation suit. In the Wetherbee case it is declared in the opinion that the case was tried on its merits and that the district court found that the reservation of certain mineral rights, relied upon by the defendant “did not include oil and gas”, and, as to the other mineral rights involved in the plea of prescription liberandi causa, the plea was sustained because the defendant had not exercised any such rights during a period exceeding 10 years. For those reasons the defendant in the suit was dealt with as a trespasser, notwithstanding the defendant was drilling and exploring for oil and gas for a period of 10 months before the suit was brought. That case may be distinguished from the present case in that the defendant in the Wetherbee case had no color of right to go upon the plaintiff’s land and make explorations for oil or gas. At any rate the decision is not such a precedent as would justify a judgment such as the plaintiff asks for in the present case. To order the defendant in this case to assert its claim to the mineral rights by way of*a petitory action, or an action in revindication, within a time to be fixed in the judgment, would compel the defendant to surrender its possession and to stop exercising the mineral rights, and to surrender to the plaintiff all of its producing oil wells — to the number exceeding 100
 
 *636
 
 wells — which the defendant’s lessees have drilled at an enormous cost. Such a decision would mean that one who possesses a tract of land as owner under a deed in which it is declared that the mineral rights are excluded, may bide his time for a period of 10 months while one who holds a recorded title to the mineral rights spends hundreds of thousands — perhaps millions —of dollars drilling 63 producing oil wells, and may then step in and successfully sue to compel the driller and operator of the wells to surrender possession of them and assert his claim by way of a petitory action or an action in revindication. We say that that would be the logical consequence of a judgment for the plaintiff in this case because a petitory action Can be brought only against a party in possession, and by one who is not in possession, of the property in contest.
 

 The basis for the plaintiff’s contention that the drilling operations had continued only 10 months when this suit was brought is that the first producing well was the first well that was drilled upon land owned by the plaintiff in this suit. It appears that, although the dry holes that were drilled previous to the bringing in of the producing well on March 25, 1940, were drilled on the two tracts of land on which the defendant, Louisiana Central Oil & Gas Company, bought the mineral rights from the Louisiana Central Lumber Company on May 25, 1926, these dry holes were not drilled on that part of the land which belongs to the plaintiff in this suit. The defendant contends that the drilling of these wells on each one of the two tracts on which the defendant owned the mineral rights prevented the rights from being lost by the prescription of 10 years liberandi causa, notwithstanding the wells were not drilled on the plaintiff’s part of either of the two tracts of land. In support thereof the defendant relies upon Connell v. Muslow Oil Co., 186 La. 491, 172 So. 763; Allison v. Maroun, 193 La. 286, 190 So. 408; and In re Mt. Forest Fur Farms of America, Inc., 6 Cir., 122 F.2d 232. Those cases are authority for the proposition that a party who acquires the mineral rights in one continuous tract of land may by drilling on any part of the tract protect his rights on the whole tract against loss by the prescription of ten years liberandi causa, notwithstanding a third party bought and went into possession of a part of the land after the owner had disposed of the mineral rights. These conflicting'contentions of the parties in this suit have reference to the title to the mineral rights, and are out of place in a jactitation suit.
 

 It is contended by the plaintiff that the Louisiana Central Lumber Company could not lawfully increase the burden of the mineral servitude on the land which the company had sold to the plaintiff on July 31, 1926, by putting on record the sale of the mineral rights on a larger area embracing the plaintiff’s land. What we mean by making the servitude more burdensome is that the prescription of 10 years against the servitude might be interrupted not only by drilling on the land sold to the Bastrop Pulp & Paper Company but also by drilling on any other part of the larger area of land on which the lumber company sold the min
 
 *638
 
 eral rights to its subsidiary, the Louisiana Central Oil & Gas Company. It is contended that the withholding of the deed of the mineral rights from the public records until a short time before the sale of the land to the Bastrop Pulp & Paper Company was consummated was tantamount to fraud on the part of the Louisiana Central Lumber Company and its subsidiary, the Louisiana Central Oil & Gas Company. The defendants deny that any such fraud was committed, and moreover aver that plaintiff in this case has no right to make the accusation of fraud. The reason for that is that the plaintiff, International Paper Company, had no interest in the property at the time when the lumber company sold the mineral rights to its subsidiary, the Louisiana Central Oil & Gas Company. Besides which, the plaintiff’s author in title, Bastrop Pulp & Paper Company, had no cause or right to charge fraud on the part of the lumber company in the matter of the sale of the mineral rights to its subsidiary, because in the sale of the land to the Bastrop Pulp & Paper Company the mineral rights were excluded. Moreover, the sale of the mineral rights to the Louisiana Central Oil & Gas Company had been on record a year' and six months when the Bastrop Pulp & Paper Company (afterward named Southern International Paper Company) sold the land to the International Paper Company, on December
 
 9, 1927;
 
 and the sale of the mineral rights to the Louisiana Central Oil & Gas Company had been on record nearly four years when, on May 16, 1930, the International Paper Company sold the land to the Southern Kraft Corporation, which corporation was afterwards merged or consolidated with the International Paper Company, now the only plaintiff in this suit.
 

 It is admitted by counsel for the Louisiana Central Oil & Gas Company that it is or was at the time when it acquired its mineral rights from the Louisiana Central Lumber Company a subsidiary of the lumber company, in the sense that the lumber company owned the stock of the oil and gas company and that they had the same officers and board of directors. But the corporations were separate and distinct entities in that each had its own charter, the one being organized and authorized to carry on the business of manufacturing lumber, and the other being organized and authorized to engage in the business of producing and dealing in oil and gas. We doubt therefore that the Louisiana Central Oil & Gas Company was a mere instrumentality, or an alter ego, of the Louisiana Central Lumber Company. Aside from these arguments of counsel for the defendant, in answer to the plaintiff’s accusation that there was fraud in the transfer of the mineral rights by the lumber company to the oil and gas company, it is obvious that that issue also is irrelevant in this jactitation suit. The petition in this suit, as originally filed, contained some allegations which were appropriate to a petitory action, and some which might have warranted a consideration by the court of the question of validity and genuineness of the transfer of the mineral rights by the lumber company to the oil and gas company dated May 25, 1926; but, in response to a motion by
 
 *640
 
 the defendants to order the plaintiff to elect whether to limit its suit to a mere jactitation suit or to put at issue the title to the mineral rights in the land, the plaintiff elected to limit its suit to a jactitation suit; and, in the amendment of its original petition, the plaintiff averred that the suit was merely a jactitation suit and that the original petition should be so construed and interpreted, and prayed that any allegation therein — and any part of the prayer thereof — that might not be consistent with a petition in a jactitation suit, should be considered as surplusage. The judgment rendered in this case therefore cannot affect either party’s claim of ownership of the mineral rights.
 

 Our conclusion is that the judgment appealed from is correct.
 

 The judgment is affirmed.
 

 ODOM, J., absent