77 So.2d 533

Walter and Pearl DIXON

v.

AMERICAN LIBERTY OIL COM-
PANY et al.

Mrs. Minnie ROBINSON et al.

v.

AMERICAN LIBERTY OIL COM-
PANY et al.

Nos. 41834, 41835.

Nov. 8, 1954.

Rehearing Denied Jan. 10, 1955.

Thompson, Thompson & Sparks, Monroe, for plaintiffs-appellants.

Ledoux R. Provosty, Provosty, Sadler & Scott, Alexandria, Cook, Clark & Egan, Hargrove, Guyton, Van Hook & Hargrove, Shreveport, for amicus curiæ.

Oliver & Oliver, Monroe, Hunt & Morris, Rayville, Sholars, Gunby & Guthrie, Monroe, for defendants-appellees and appellants.

Shotwell & Brown, Monroe, Verne H. Maxwell, Dallas, Tex., Plauche & Plauche, Lake Charles, for defendants-appellees.

McCALEB, Justice.

These consolidated jactitation suits involve the possession of two strips of land situated in the E½ of the SE¼ of Section 11, T. 16 N., R. 8 E., Franklin Parish, one of which contains approximately 18.51 acres and the other 9.37 acres. Claiming that they have possession of the mineral rights by virtue of their possession of the surface, plaintiffs aver that the defendants have slandered their title by recording certain deeds and mineral leases, and by extracting oil beneath the land under the asserted authority of spacing unit orders of the Conservation Department. The petitions pray for judgment ordering defendants either to disclaim title to the property involved or to bring a petitory action within a time to be fixed by the court.

The plaintiffs in suit No. 41,834, Walter and Pearl Dixon, acquired the NW¼, of the SW¼, Section 12, T. 16 N., R. 8 E., from Mrs. Dixon's mother, who had previously bought it from Sherman Fife in 1901. In suit No. 41,835, the plaintiffs are

the surviving spouse and heirs of Henry Max Robinson, who purchased the S½ of the SW¼ of Section 12, T. 16 N., R. 8 E., from John Walker in 1920. John Walker acquired this tract in 1903.

The evidence shows that, in 1910, a fence and a road were constructed by Henry Max Robinson, husband of plaintiff, Mrs. Minnie Robinson, and father of Mrs. Dixon, along the west boundary of the two tracts. At that time, he was in possession as owner of the N½ of the SW¼ of Section 12 and John Walker was in possession of the S½ of the SW¼. The road became known as the "Max Robinson" road and was generally recognized as the boundary between the tracts owned by Robinson and Walker and the property adjoining it on the west. In point of fact, however, the fence and the road were not located on the correct line dividing Sections 11 and 12 as they lay some 500 feet to the west of that line, thus enclosing within their confines the 18.51 acres claimed in the Dixon suit and the 9.37 acres involved in the Robinson suit. All of this acreage was possessed and devoted to farming operations by plaintiffs as owners, uninterruptedly from the time of their respective acquisitions until the present, or presumably beyond the 30 year period necessary to acquire land by adverse possession under Article 3499 of the LSA–Civil Code.

In December of 1935, defendant, J. E. Holt, acquired by deed the E½ of the SE¼ of Section 11, T. 16 N., R. 8 E., thus becoming the record title owner of the strips of land involved in these suits. In 1941, he granted a mineral lease of the above described land to C. H. Murphy, Jr. and, in 1945, conveyed a ⅔ interest in the property by deed to C. H. Murphy, Sr. Thereafter, C. H. Murphy, Jr. subleased to defendant, American Liberty Oil Company, retaining a ½₄ overriding royalty interest in the lease, which he assigned on June 1, 1951, to Murphy Corporation, William C. Nolan and Theodosia M. Nolan. By acts of assignment of various dates between 1945 and 1949, defendants, American Liberty Oil Co., Delhi Oil Corporation and A. E. Oldham, became owners in indivision of the mineral leasehold interests and, in 1948, these mineral lessees drilled two producing oil wells on the E½ of the SE¼ of Section 11. Specifically, American Liberty Holt No. 7 was completed on a 40-acre unit comprising the NE¼ of the SE¼ of Section 11 and Holt No. 8 was completed on a unit embracing the SE¼ of the SE¼ of Section 11.

Prior to the completion of these wells, the Department of Conservation had issued orders forming drilling and proration units of each regular governmental ⅟₁₆th section. As a consequence, Holt No. 7, although not located on the strip of land held by the Dixons, was deemed sufficient to draw its unit, and is still withdrawing oil from under that strip. In like manner, Holt No. 8, situated in the SE¼ of the SE¼ of Section 11, but not on the strip possessed by the Robinsons, is and has been draining the oil under that portion of the land.

In view of the foregoing facts, the defendant mineral lessees and sub-lessees contend that they, and not the plaintiffs, are in possession of the minerals. In addition to challenging plaintiffs' alleged possession of the minerals in limine and in their answers, defendants have filed reconventional demands, under the authority of Article 52 of the Code of Practice, in which they assert that plaintiffs, by the pretensions and claims in the petitions, are disturbing their peaceful possession of the minerals. Likewise, defendants Holt and Murphy, Sr.,[1] the lessors and record owners of the entire E½ of the SE¼, maintain that they are in possession, by virtue of the acts and explorations of their mineral lessees, and that this possession nullifies all of plaintiffs' claims, including their possession of the surface of the lands.

After a hearing on the issues thus formed by the pleadings, the trial judge concluded that, whereas plaintiffs had possession of the surface of both strips of land, they had no claim to possession of the mineral rights. He accordingly gave judgment dismissing their suits as to the minerals, but recognizing their possession of the surface of both strips, and ordering the lessor-defendants to institute a petitory action against the plaintiffs in revendication of their title to the lands within 90 days or be forever barred from setting up any claim thereto other than to the minerals and mineral rights on, in and under the same. The plaintiffs and the lessor-defendants have appealed from the judgments.

██ It is clear from the facts, as we find them, that plaintiffs had been in corporeal possession of the strips of land involved as owners thereof for over 30 years at the time the suits were instituted. Of course, prior to the completion of the 30-year period, they were without claim of ownership (except as noted infra in footnote No. 2) but now they exhibit with their evidence of possession a prima facie prescriptive title, the validity of which may not be tested in these jactitation suits. This being so, plaintiffs are entitled to maintain the actions for slander of their titles for it is well settled that such actions are available to those in actual possession as owner and against those who are not in possession but who claim any right or interest in the property. Siegel v. Helis, 186 La. 506, 172 So. 768; Rudd v. Land Co., 188 La. 490, 177 So. 583; Allison v. Maroun, 193 La. 286, 190 So. 408 and International Paper Co. v. Louisiana Central Lumber Co., 202 La. 621, 12 So.2d 659.

██ It is also firmly established in our jurisprudence that one having possession of the surface of a tract of land as owner may maintain a jactitation suit against one who slanders his title by claiming mineral rights in the land. Frost-Johnson Lumber

---

1. Since the taking of this appeal, Mr. C. H. Murphy Sr. died and his executors have been made parties in his place and stead.

Co. v. Salling's Heirs, 150 La. 756, 91 So. 207; International Paper Co. v. Louisiana Central Lumber Co., supra; Lenard v. Shell Oil Co., 211 La. 265, 29 So.2d 844 and Ware v. Baucum, 221 La. 259, 59 So.2d 182. However, this rule, as stated in the International Paper Co. case [202 La. 621, 12 So.2d 662], is subject to certain qualifications "* * * one of which is that if the possessor of the land holds under a deed which on its face excepts the mineral rights, or if the so-called slanderer holds a recorded deed for the mineral rights, the possessor of the surface of the land—in order to maintain his jactitation suit—must allege and make a prima facie showing that the outstanding claim of the slanderer for the mineral rights has been extinguished by the prescription of ten years liberandi causa".

In the cases at bar, the defendants profess that they come within the exception stated in the International Paper Co. case because they have captured and are possessing the minerals. It is asserted that the lease granted by Holt, the record owner of all of the E½ of the SE¼ of Section 11, was a dismemberment of the minerals from the land itself and created in the mineral lessees, by authority of Act 205 of 1938, as amended and incorporated into the Revised Statutes as LSA–R.S. 9:1105, a real right which, when exercised by the completion of the wells and reduction of the minerals to their possession, constituted a possession and ownership of all mineral rights separate and apart from the land under which they were located.

It is true, of course, that the possession of the surface of the land does not of itself constitute the possession of the minerals lying thereunder as minerals can only be possessed when they are severed from the soil. But, until they are severed, possession and ownership of the surface carries with it the right to reduce the minerals to possession, and such right may be protected by a possessory action or one in jactitation. See cases cited supra. The surface owner's right to maintain a jactitory suit to protect his mineral rights can only be denied, as we understand the law, in cases where the possessor claims under a title wherein the mineral rights have been reserved or sold to another, i. e.,—by the creation of a mineral servitude. But a mineral lease is not a mineral servitude and does not produce the same legal effect for, though it is characterized as a real right in LSA–R.S. 9:1105, it is merely a contract which permits the lessee to explore for minerals on the land of the lessor in consideration of the payment of a rental and/or bonuses. It places no charge whatever on the land and cannot be put in the same classification as a mineral servitude, which is an incorporeal immovable that attaches to the land itself. See Arnold v. Sun Oil Co., 218 La. 50, 48 So.2d 369 and cases there cited.

■ Accordingly, we rule that the mineral lease held by defendant-lessees did not produce a severance of the minerals from the lands or in anywise affect the rights of plaintiffs, as possessors of the strips, to maintain these actions for slander of title to the minerals.

· But all of the defendants, pointing to the drilling operations which have been conducted upon the E½ of the SE¼ of Section 11, conformably with the spacing orders of the Conservation Commission establishing drilling units, declare that they have lawfully severed the minerals lying under the strips in controversy from the land itself and thus possess the mineral rights adversely to the possessors of the surface. Counsel contend that this position is sustained by Connell v. Muslow Oil Co., 186 La. 491, 172 So. 763; In re Mt. Forest Fur Farms of America, Inc., 6 Cir., 122 F.2d 232; Lenard v. Shell Oil Co. Inc., supra and the International Paper Co. case.

We do not consider that the cited cases control the situation presented here. In each of those cases, there were two separate possessions (land and mineral) which had been made possible by the existence of mineral servitudes on the properties. The effect of segregated possessions was succinctly clarified by the court in a per

curiam to the refusal of an application for a rehearing in Lenard v. Shell Oil Co., which was written in answer to a charge that the opinion indicated and recognized that there could be two estates in property in Louisiana, one of land and one of minerals. It was declared, see 211 La. 287, 29 So.2d 851, that we did not intend to say that two estates of corporeal property had been created; that what we did say was that the error in the district judge's reasoning resulted from his omission " * * * to observe that the act creating the mineral servitude made possible two possessions of the property, i. e., the possession of the mineral servitude and the possession of the land itself, and hence that the mineral servitude was subject to possession and was in fact possessed by the owner thereof adversely to the owner of the 30 acres of land".

■ As heretofore explained, the absence of a mineral servitude in the instant cases rendered separate possessions of the soil and the minerals impossible. It is true, of course, that, during the thirty years that plaintiffs were in possession of the two strips of land without semblance of any title,[2] the real owner could have ousted them and had the right, by reason of his ownership, to reduce the minerals lying un-

---

2. Save possibly a boundary action under Article 852 of the LSA–Civil Code. See also Opdenwyer v. Brown, 155 La. 617, 99 So. 482. Plaintiffs have filed a plea of prescription in this case under Article 852. We are unable to consider the validity of this plea, as the issue of title cannot be tried in a jactitory or possessory action. Title or ownership in these cases is admissible only to the extent necessary to determine whether plaintiff is actually in possession as owner.

der the strips to possession. And, if the owner had elected to drill a well on the land, his action would have undoubtedly effected an ouster of plaintiffs from possession. Therefore, the question remains as to whether the drilling operations conducted on another part of the lands, which were not in plaintiffs' physical possession, and the withdrawal of oil from under the strips by virtue of those operations, constituted such an eviction of plaintiffs from their possession of the mineral rights as to bar them from pursuing the relief sought herein.

In delving for the solution of this question, it is well to again bear in mind that we are not here dealing with two separate possessions, one of minerals and one of land, for the reasons above pointed out. Rather, now, we are confronted with the problem as to whether the withdrawal of the oil from under the strips effected an ouster of plaintiffs' real and actual possession of the property. Under Article 49 of the Code of Practice, such possession is essential to the maintenance of these actions.[3]

We entertain little difficulty in resolving the issue in plaintiffs' favor. It is manifest from an examination of the articles of the Code of Practice which pertain to the possessory action that they apply only to disturbances of the surface of the land possessed as owner; such possession, under Article 505 of the LSA–Civil Code, carries with it the ownership of all that is directly above and under the soil. This Article bestows upon the possessor of the soil the fictional possession of the minerals lying thereunder or at least the exclusive right to explore for and reduce such minerals to his possession. And this possession or right of possession, according to an unbroken line of jurisprudence beginning with Frost-Johnson Lumber Co. v. Salling's Heirs, supra, may be protected from disturbance by the jactitory or possessory action.

Applying this reasoning to these cases, it becomes evident that the withdrawal of the oil from under the strips of land, which began in 1948 and in no wise interfered with plaintiffs' physical possession of the surface, did not operate as an ouster of their possession. and, upon the accrual of the 30-year prescription, when their adverse possession ripened into ownership,[4] they became entitled to pur-

---

3. The conditions prescribed for possessory actions are applicable to an action in jactitation or slander of title. See Green v. George, 213 La. 739, 35 So.2d 595 and cases there cited.

4. Our statement that the plaintiffs acquired title by adverse possession of 30 years is not to be construed as a find-ing that their titles are good, as the matter of title is not determinable in jactitory or possessory actions. However, as observed in the International Paper Co. case, [202 La. 621, 12 So.2d 660] title or ownership may be considered by the court "to the extent necessary to determine whether the plaintiff is really in possession as owner of the property."

sue the jactitory or possessory actions for the purpose of deterring defendants from slandering their titles by claiming ownership of the minerals extracted from under the lands.[5] Authorities such as Everett v. Phillips Petroleum Co., 218 La. 835, 51 So.2d 87; Sohio Petroleum Co. v. V. S. & P. R. R., 222 La. 383, 62 So.2d 615 and Smith v. Holt, 223 La. 821, 67 So.2d 93, relied on by defendants, are not applicable to these suits for, whereas the drilling and production of oil from a unitized area constitutes an exercise and user of mineral rights throughout the entire unit and operates as a substitute for performance of drilling obligations contained in a mineral lease, these acts are not to be regarded as an eviction of the surface owner's possession of the minerals or of his exclusive right thereto when the explorations are not conducted on the land itself.

Finally, defendants have pleaded the prescription of one year provided by Articles 49 and 59 of the Code of Practice and Article 3456 of the LSA–Civil Code [6] which require that possessory actions be brought within one year after the disturbance took place.

It is contended initially, under this plea, that the recorded deed of Holt, dated in 1935, can hardly be viewed as a slander of plaintiffs' title for the obvious reason that they had no title whatever at that time and that it would be unreasonable to stretch the action of jactitation so far as to have it cover such a situation. And the same is said with reference to all documentary titles, as well as the mineral lease, which were placed of record prior to the time that plaintiff had any claim of ownership by prescription to the strips of land.

We find no merit in this point. While it is true that these titles and other deeds, including the mineral lease, did not slander plaintiffs' titles at the time they were recorded, they have undoubtedly operated as a continuing slander from the date of plaintiffs' asserted prescriptive titles.

5. There is also no doubt that plaintiffs had a cause of action under Article 47 of the Code of Practice even before the accrual of prescription by reason of their possession of the lands as owners. However, for practical purposes, such an action would have availed nothing against these defendants who were, at that time (1948), the record owners and lessees of the lands.

6. The applicable portions of these Articles require of the possessor:
Code of Practice, Article 49, Par. 4 "That he should have brought his suit, at the latest, within the year in which the disturbance took place."

Code of Practice, Article 59. "If one who is disturbed in or evicted from his possession, suffer a year to elapse without bringing the possessory action, that action shall be prescribed * * *".

Article 3456 of the LSA–Civil Code. "But this, which is called the possessory action, must be commenced by the possessor within a year, reckoning from the time when he was disturbed; for if he leaves the person evicting him in possession for one year, without complaint, he shall lose his possession, whatever apparent right he may have had to it, and shall be driven to his action for the ownership of the property".

in view of defendants' repeated claims that plaintiffs are without right to possession and that they, defendants, are in legal possession. And, because we regard these recordations, coupled with defendants' claims, as continuing slanders, it is clear that the actions are not prescribed as the slanders presently persist uninterruptedly as long as the inscriptions remain of record. See Jackson v. Davis, La.App., 49 So.2d 497 and Green v. Chamberlain, La.App., 60 So.2d 120. In Jackson v. Davis, the court doubted that the codal requirement, that the possessory action be brought within a year from the date of the disturbance, could fairly be applied to actions in jactitation forasmuch as those articles envisioned a physical disturbance of the plaintiff's possession as owner. We think that there is considerable substance in this view but it suffices here to hold that prescription has not run because of the continuing nature of the slanders.

Counsel for defendants further say that the actions are prescribed because the withdrawal of oil from the strips of land since 1948 constituted an actual disturbance of plaintiffs' possession.

But we consider that the extraction of the oil from under plaintiffs' land cannot be viewed as a disturbance of their possession within the meaning of Articles 49 and 59 of the Code of Practice and 3546 of the LSA–Civil Code, as those articles contemplate a disturbance of the possessor's physical dominion over the land.

Indeed, forasmuch as defendant-lessees were acting under valid spacing orders of the Department of Conservation, plaintiffs were without legal right to restrain the operations and it would therefore appear that the oil withdrawn from under the strips did not effect a disturbance of their possession or right to possession thereto in any respect. Actually, in view of the orders of the Conservation Commission, defendant-lessees are extracting the oil as plaintiffs' agents pro hac vice and must account to them for it, unless they can show, in an appropriate action to try title, that plaintiffs are not the legal owners of the land.

For the foregoing reasons, the judgments appealed from are reversed in part and are recast so as to read as follows·

In Suit No. 41,834, It Is Ordered, Adjudged And Decreed that plaintiffs, Walter Dixon and Mrs. Pearl Dixon, have and recover judgments against Bertie W. Murphy and Charles H. Murphy, Jr., executors of the Succession of C. H. Murphy, J. E. Holt, American Liberty Oil Company, Delhi Oil Corporation, A. E. Oldham, First National Bank, Murphy Corporation, W. C. Nolan and Theodosia M. Nolan, recognizing plaintiffs' possession of the land and minerals thereunder described in their petition as follows:

"All that part of the E½ of SE¼, Section 11 Township 16, North, Range 8 East, Franklin Parish, Louisiana, more particularly described as follows: Begin at the southeast corner of Sec-

tion 11, Township 16 North, Range 8 East and run thence North 0 deg 03″ West along the East boundary of said Section 11, 782.5 feet to a point of intersection with a fence for a point of beginning; thence continue 0 deg 03′ west along the East boundary of Section 11, 1446.5 feet to a point of intersection with a fence; thence North 76 deg 28′ west along said fence and its projection, 566.5 feet to a point on the west side of the Max Robinson Road; thence south along the West side of said road 143.6 feet; thence south 0 deg 27′ west along the west side of said road 250 ft; thence south 0 deg 40′ east along the west side of said road, 1065.4 feet to a point on a projection of the line of a fence running in a general easterly direction; thence south 70 deg 59′ east along said fence and its projection 340 ft; thence north 68 deg 49′ East along said fence 26 feet; thence south 78 deg 47′ east along said fence, 60 feet; and thence south 86 deg 02′ East along said fence, 7.3 feet back to the point of beginning containing 18.51 acres, more or less."

It Is Further Ordered that the above named defendants, collectively or individually, institute a petitory action against the plaintiffs in revendication of their titles to the land involved in this suit, and to the minerals and mineral rights on, in and under said land, within ninety days after this judgment shall have become final and, in default of such suit or suits being instituted within the time fixed, that defendants be forever thereafter barred from setting up any title to the land above described or to the minerals and mineral rights on, in and under the same and that plaintiffs be empowered to cause the Clerk of Court for Franklin Parish, Louisiana, to erase from the conveyance records of the Parish:

(a)   Deed dated December 13, 1935, from Wyatt Lumber Co. Inc. to J. E. Holt, covering all of Section 11 T. 16 N. R. 8 East, of record in Notarial Book 28, page 133;

(b)   Oil and gas lease dated December 11, 1941, from J. E. Holt to C. H. Murphy, Jr., covering, among other property, the E½ of SE¼, Section 11, T. 16 N. R. 8 E of record in Notarial book 41 page 587;

(c)   Amendment to lease (b) above as to royalty to be paid, dated December 1, 1944 by and between J. E. Holt and C. H. Murphy, Jr., of record in Notarial book 51 page 639;

(d)   Deed dated September 11, 1945, from J. E. Holt to C. H. Murphy covering ⅔ interest in, among other property, E½ of SE¼, Section 11, T. 16 N., R. 8 E., of rceord in Notarial book 56, page 576;

(e)   Power of Attorney dated February 6, 1943 from C. H. Murphy, Jr., to C. H. Murphy, Sr., of record in Notarial book 53, page 97;

(f)   Assignment dated September 25, 1945, from C. H. Murphy, Jr., (through C.

H. Murphy Sr., agent) to American Liberty Oil Company of lease described under (b) hereof as amended covering, among other property, E½ of SE¼, Section 11, T-16 N., R-8-E, of record in Notarial Book 57, page 86. Assignor reserved in the sale ¹⁄₂₄th overriding royalty;

(g) Assignment dated October 1, 1945, from American Liberty Oil Company to Southern Union Gas Company of ½ of all rights acquired under assignment (f) of record in Notarial Book 59, page 437, and assignment of this interest by instrument dated October 2, 1945 from Southern Union Gas Company to Southern Union Development Company of record in Notarial Book 59, page 515, and certificate dated April 5, 1946 changing name of Southern Union Development Company to Delhi Oil Corporation of record in Notarial Book 62, page 105;

(h) Assignment dated October 9, 1945, from American Liberty Oil Company to Bluebird Investment Company of ⅜ths of all rights acquired under assignment (f) above, of record in Notarial book 59, page 494;

(i) Assignment dated February 5, 1946, from American Liberty Oil Company to A. E. Oldham of ¹⁄₁₆th of all rights acquired under assignment (f) above, of record in Notarial book 60, page 20;

(j) Royalty deed dated October 11, 1946, from C. H. Murphy to J. E. Holt covering ¹⁄₃₂nd of all oil and gas produced from, among other property, the E½ of SE¼,

Section 11, T. 16-N, R-8-E, of record in Notarial book 72 page 546;

(k) Assignment dated September 11, 1948, from American Liberty Oil Company to American Liberty Oil Corporation of all its rights in and to lease (b) above, as amended, and all of its rights obtained by assignment (f) above, of record in Notarial book 71, page 64;

(l) Assignment dated September 11, 1948, from Bluebird Investment Company to American Liberty Oil Corporation of all of its rights in and to lease (b) above, of record in Notarial book 71, page 66; ·

(m) Certificate dated September 27, 1948, changing name from American Liberty Oil Corporation to American Liberty Oil Company, of record in Notarial book 70, page 210;

(n) Correction assignment dated October 10, 1949, from American Liberty Oil Company to American Liberty Oil Corporation correcting error in range number of exhibit attached to assignment (k) above, of record in Notarial book 72 page 599;

(o) Correction assignment dated October 10, 1949, from Bluebird Investment Company to American Liberty Oil Corporation, covering error in range number in assignment (l) above, of record in Notarial book 72, page 60;

(p) Declaration of Pooling dated November 8, 1949, by and between American Liberty Oil Company, Delhi Oil Corporation, and A. E. Oldham as to SE¼ of SE¼, Section 11, T. 16-N., R-8-E., in

which ownership of working interest in lease (b) as amended is declared to be:

American Liberty Oil Company     7/16ths
Delhi Oil Corporation     1/2
A. E. Oldham     1/16th

of record in Notarial book 73, page 154;

(q) Assignment of overriding royalty dated June 1, 1950, from C. H. Murphy, Jr., to William C. Nolan, Theodosia M. Nolan and Murphy Corporation, covering 1/24th overriding royalty reserved by C. H. Murphy, Jr., in assignment (f) above, as follows:

Murphy Corporation     87½%
William C. and
Theodosia M. Nolan     12½%

as per assignment of record in Notarial book 75, page 329;

(r) Mortgage dated April 29, 1952, from American Liberty Oil Company to First National Bank, Dallas, Texas, for $1,000,-000 covering, among other property, Lease (b) herein described, of record in Mortgage book 32, page 609.

insofar as said deeds or other inscriptions affect the property hereinabove described.

And, in Suit No. 41,835, It Is Ordered, Adjudged And Decreed that plaintiffs, Mrs. Minnie M. Robinson, Mrs. Pearl R. Dixon and Mrs. Betty R. Cryder have and recover judgment against Bertie W. Murphy and Charles H. Murphy, Jr., executors of the Succession of C. H. Murphy, J. E. Holt, American Liberty Oil Company, Delhi Oil Corporation, A. E. Oldham, First National Bank, Murphy Corporation, W. C. Nolan and Theodosia M. Nolan, recognizing plaintiffs' possession of the land and minerals thereunder described in their petition as follows:

"All that part of the SE¼ of SE¼, Section 11, T–16–N., R–8–E., Franklin Parish, Louisiana, more particularly described as follows:

"Beginning at the southeast corner of Section 11, T–16–N, R–8–E, and run thence North 0°–03′ West along the east boundary of said Section 11, 782.5 feet to a point of intersection with a fence; thence North 86°–02′ West along said fence, 7.3 feet; thence North 78°–47′ West along said fence, 60 feet; thence South 68°–49′ West along said fence, 26 feet; thence North 87°–06′ West along said fence, 130 feet; thence North 70°–59′ West along said fence, 300 feet to fence running in a general southerly direction; thence South 4°–31′ West along said fence, 152 feet; thence South 1°–53′ East along said fence, 665 feet; thence South 76°–09′ East along said fence, 80 feet; thence South 7°–16′ East along said fence, 54.9 feet to a point of intersection with the south boundary of Section 11; thence North 89°–58′ East along the south boundary of Section 11, 410 feet, back to the Point Of Beginning, containing 9.37 acres, more or less."

It Is Further Ordered that the above-named defendants, collectively or individually, institute a petitory action against the plaintiffs in revendication of their titles to the land involved in this suit, and to the minerals and mineral rights on, in and under said land, within ninety days after this judgment shall have become final and, in default of such suit or suits being instituted within the time fixed, that defendants be forever thereafter barred from setting up any title to the land above described or to the minerals and mineral rights on, in and under the same and that plaintiffs be empowered to cause the Clerk of Court for Franklin Parish, Louisiana, to erase from the conveyance records of the Parish:

(a) Deed dated December 13, 1935, from Wyatt Lumber Co. Inc. to J. E. Holt, covering all of Section 11, T. 16 N. R. 8 E., of record in Notarial Book 28, page 133;

(b) Oil and gas lease dated December 11, 1941, from J. E. Holt to C. H. Murphy, Jr., covering, among other property, the E½ of SE¼, Section 11, T. 16 N. R. 8 E. of Record in Notarial book 41 page 587;

(c) Amendment to lease (b) above as to royalty to be paid, dated December 1, 1944, by and between J. E. Holt and C. H. Murphy, Jr., of record in Notarial book 51 page 639;

(d) Deed dated September 11, 1945, from J. E. Holt to C. H. Murphy covering ⅔ interest in, among other property, E½ of SE¼, Section 11, T. 16 N. R. 8 E., of record in Notarial book 56, page 576;

(e) Power of Attorney dated February 6, 1943, from C. H. Murphy, Jr., to C. H. Murphy, Sr., of record in Notarial book 53, page 97;

(f) Assignment dated September 25, 1945, from C. H. Murphy, Jr., (through C. H. Murphy, Sr., agent) to American Liberty Oil Company of lease described under (b) hereof as amended covering, among other property, E½ of SE¼, Section 11, T-16, N., R-8-E., of record in Notarial Book 57, page 86. Assignor reserved in the sale ½₄th overriding royalty;

(g) Assignment dated October 1, 1945, from American Liberty Oil Company to Southern Union Gas Company of ½ of all rights acquired under assignment (f) of record in Notarial Book 59, page 437, and assignment of this interest by instrument dated October 2, 1945 from Southern Union Gas Company to Southern Union Development Company of record in Notarial Book 59, page 515, and certificate dated April 5, 1946 changing name of Southern Union Development Company to Delhi Oil Corporation of record in Notarial Book 62, page 105;

(h) Assignment dated October 9, 1945, from American Liberty Oil Company to Bluebird Investment Company of ⅜ths of all rights acquired under assignment (f) above, of record in Notarial book 59, page 494;

(i) Assignment dated February 5, 1946, from American Liberty Oil Company to A. E. Oldham of ⅟₁₆th of all rights acquired

under assignment (f) above, of record in Notarial book 60, page 20;

(j) Royalty deed dated October 11, 1946, from C. H. Murphy to J. E. Holt covering 1/32nd of all oil and gas produced from, among other property, the E½ of SE¼, Section 11, T–16–N, R–8–E, of record in Notarial book 72, page 546;

(k) Assignment dated September 11, 1948, from American Liberty Oil Company to American Liberty Oil Corporation of all its rights in and to lease (b) above, as amended, and all of its rights obtained by assignment (f) above, of record in Notarial book 71, page 64;

(*l*) Assignment dated September 11, 1948, from Bluebird Investment Company to American Liberty Oil Corporation of all of its rights in and to lease .(b) above, of record in Notarial book 71, page 66;

(m) Certificate dated September 27, 1948, changing name from American Liberty Oil Corporation to American Liberty Oil Company, of record in Notarial book 70, page 210;

(n) Correction assignment dated October 10, 1949, from American Liberty Oil Company to American Liberty Oil Corporation correcting error in range number of exhibit attached to assignment (k) above, of record in Notarial book 72 page 599;

(*o*) Correction assignment dated October 10, 1949, from Bluebird Investment Company to American Liberty Oil Corporation, covering error in range number in assignment (*l*) above, of record in Notarial Book 72, page 60;

(p) Declaration of Pooling dated November 8, 1949, by and between American Liberty Oil Company, Delhi Oil Corporation, and A. E. Oldham as to SE¼ of SE¼, Section 11, T. 16–N, R–8–E, in which ownership of working interest in lease (b) as amended is declared to be:

| | |
|---|---|
| American Liberty Oil Company | 7/16ths |
| Delhi Oil Corporation | ½ |
| A. E. Oldham | 1/16th |

of record in Notarial book 73, page 154;

(q) Assignment of overriding royalty dated June 1, 1950, from C. H. Murphy, Jr. to William C. Nolan, Theodosia M. Nolan and Murphy Corporation, covering 1/24th overriding royalty reserved by C. H. Murphy, Jr., in assignment (f) above, as follows:

| | |
|---|---|
| Murphy Corporation | 87½% |
| William C. and Theodosia M. Nolan | 12½% |

as per assignment of record in Notarial book 75, page 329.

(r) Mortgage dated April 29, 1952, from American Liberty Oil Company to First National Bank, Dallas, Texas, for $1,000,-000 covering, among other property, Lease (b) herein described, of record in Mo:tgage book 32, page 609.

insofar as said deeds or other inscriptions affect the property hereinabove described.

Defendants are to pay all costs of these suits.

HAMITER, Justice (dissenting).

Assuming that the jactitation action is appropriate in adjudging disputed mineral rights, as to such appropriateness I entertain considerable doubt and so expressed it in Ware v. Baucum, 221 La. 259, 59 So.2d 182. I am satisfied that this cause is governed by our decisions in International Paper Co. v. Louisiana Central Lumber Co., 202 La. 621, 12 So.2d 659 and Lenard v. Shell Oil Co., Inc., 211 La. 265, 29 So.2d 844. The doctrine announced and applied therein is to the effect that one in possession of the surface of a parcel of land cannot maintain the jactitation action respecting the mineral rights thereto where, at the time of the filing of suit, they are being possessed adversely by another through and by means of drilling and production operations.

In those cases the drilling operations constituting the adverse possession were conducted by persons holding leases obtained from the *owners of outstanding mineral servitudes.* And that factual situation, slightly different from the one in the instant cause which is that the lease authorizing and providing for the drilling undertaken was granted by the record fee owner (of both surface and minerals), perhaps prompted the basically important observation contained in the majority opinion that, "The surface owner's right to maintain a jactitory suit to protect his mineral rights can *only* be denied, as we understand the law, in cases where the possessor claims under a title wherein the mineral rights have been reserved or sold to another, i. e.,—by the creation of a mineral servitude." (Italics mine.)

But I do not understand the International Paper Co. and Lenard cases, or any other cases in our jurisprudence, to hold that it is *only* when or where an outstanding mineral servitude is being exercised that the surface possessor is prevented from resorting to the jactitation action. If they did so hold the resulting effect would be that, under our law, the record owner of an entire property (both fee and mineral rights) does not occupy so favorable a position respecting minerals as does a mere servitude owner.

In the instant case, according to the theory of the majority opinion as I appreciate it, if Holt had conveyed one-half of his mineral rights to "X" who in turn leased them to the defendant drilling operators and they, at the same time, acquired from the record fee owner (Holt) a lease on his remaining one-half minerals, these plaintiffs could maintain the jactitation action as to the last-mentioned one-half mineral interest but not as to the former. This appears to result in an anomalous situation which, in my opinion, the law does not contemplate.

I respectfully dissent.